UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 14-81603-Civ-Marra/Matthewman

UBS FINANCIAL SERVICES, INC.,

Plaintiff,

vs.

BOUNTY GAIN ENTERPRISES,

Defendant.

_____/

FILED by _____ D.C.

**JUL 0 9 2015**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [DE 7]

**THIS CAUSE** is before the Court upon Plaintiff, UBS Financial Services, Inc.'s ("UBSFS") Motion for Preliminary Injunction and Incorporated Memorandum of Law [DE 7]. Defendant, Bounty Gain Enterprises, Inc.'s ("Bounty Gain") filed a Response in opposition [DE 20], to which UBSFS replied [DE 23].[1]   This matter was referred to the undersigned by United States District Judge Kenneth A. Marra for appropriate disposition.   [*See* DE 15].   The undersigned held an evidentiary hearing on April 17, 2015.   Following the April 17, 2015 evidentiary hearing, both UBSFS and Bounty Gain submitted supplemental memoranda.   [DEs 33, 36, 37].   This matter is now ripe for review.   For the reasons that follow, this Court

---

[1] Bounty Gain also filed a Counterclaim in this federal action [DE 19].   The Court has reviewed the Counterclaim and the facts alleged therein; however, in ruling on UBSFS' Motion for Preliminary Injunction [DE 7], the Court finds that the operative pleading is the Statement of Claim filed in connection with the FINRA arbitration.   Thus, the Court will not discuss the Counterclaim, as it is outside the scope of the FINRA arbitration that UBSFS seeks to enjoin. The undersigned will also not address in this Report and Recommendation the issue of whether, by filing a counterclaim in this federal action, Bounty Gain implicitly waived FINRA arbitration, as that issue has not been briefed by the parties.

**RECOMMENDS** that the District Court **GRANT** the Plaintiff's Motion for Preliminary Injunction [DE 7].

## Background

On December 24, 2014, Plaintiff, UBSFS, filed a Complaint for Declaratory Judgment and Injunctive Relief. [DE 1]. In the Complaint, UBSFS explains that it is a New Jersey-based Financial Industry Regulatory Authority ("FINRA") member. *Id.* at ¶ 3. Bounty Gain instituted FINRA arbitration against Plaintiffs and is seeking upwards of five million dollars in damages, along with pre-judgment interest and costs. *Id.* at ¶ 10. UBSFS alleges that it has never had any agreement to arbitrate with Bounty Gain, UBSFS does not consent to arbitration, Bounty Gain is not a customer of UBSFS, Bounty Gain never had a brokerage account with UBSFS, and Bounty Gain did not purchase any securities from UBSFS or receive any investment advice or guidance from UBSFS. Consequently, UBSFS maintains it is not required to submit to FINRA arbitration. *Id.* at ¶¶ 10-11, 13. UBSFS also stresses that UBS AG and UBSFS are separate and distinct corporate entities, and that Bounty Gain actually opened a banking relationship with UBS AG, a financial services company headquartered in Switzerland. *Id.* at ¶¶ 14-18.[2]

## Factual Background

According to the Statement of Claim filed by Bounty Gain in the FINRA arbitration, in early 2011, Bounty Gain was approached by "UBS Registered Representative Peter Ho,"[3] about

---

[2] UBS AG is not a FINRA member, while UBSFS is a FINRA member. *Id.* at ¶17.
[3] In the Statement of Claim, Bounty Gain refers to UBSFS as "UBS" [Stmt. of Claim, p. 1; DE 8-1, p. 2]. Bounty Gain's Statement of Claim repeatedly states that Peter Ho was a registered representative or agent of UBS (UBSFS). However, as will be discussed further in this Report and Recommendation, Bounty Gain's claim that Peter Ho was an agent or registered

investing in a company called Digital Domain.   [Stmt. of Claim, p. 3; DE 8-1, p.4].   Bounty

Gain alleges that it was solicited by "UBS" to "participate in a private offering of unregistered

shares of [Digital Domain] common stock with the promise that the private offering would be

priced at a significant discount in price to a planned initial public offering to commence late that

year."   [Stmt. of Claim, p. 3; DE 8-1, p. 4].   "UBS," the Statement of Claim asserts, "assured

[Bounty Gain] that . . . [it] would see a significant and immediate return on its investment

following the IPO."   [Stmt. of Claim, p. 3; DE 8-1, p. 4].   Bounty Gain further alleges that

"several members of 'UBS' in Port Saint Lucie were working with Digital Domain Florida to

raise capital and/or provide financial leverage to Digital Domain Florida and/or its principals."

[Stmt. of Claim, p. 3; DE 8-1, p. 4].   Bounty Gain asserts that "UBS representatives—Peter Ho,

Roger Lam, and Terri Lancaster,"[4] in particular—played a key role in providing Bounty Gain

with documents and information which misrepresented the health of Digital Domain and the

ultimate viability of Bounty Gain's investment.   [Stmt. of Claim, pp. 3-4; DE 8-1, pp. 4-5].

Bounty Gain asserts that Ho, Lam, and Lancaster all "acted in concert with [Digital Domain's]

agents in soliciting [Bounty Gain] to invest its funds in [Digital Domain]."   [Stmt. of Claim, p.

4; DE 8-1, p. 5].

According to the facts set forth in the Statement of Claim, on August 10, 2011, Bounty

Gain "entered into a stock purchase agreement with [Digital Domain] whereby [Bounty Gain]

purchased 625,000 shares of unregistered common stock at $8 per share for an aggregate

---

representative of UBSFS is simply false as Peter Ho never worked for UBSFS and was never a
registered representative or agent of UBSFS.
[4] Again, Bounty Gain refers to these three individuals collectively as "UBS representatives",
even though Peter Ho was never employed by UBSFS and was only employed by UBS AG, a
banking entity in Switzerland which is distinct from UBSFS and is not a member of FINRA.

purchase price of five million dollars.   [Stmt. of Claim, p. 4; DE 8-1, p. 5].   Later that same day, Bounty Gain "wired its investment funds to an account at UBS Financial Services, Inc. RMA in South Florida for further credit to Digital Domain Institute, Inc."   [Stmt. of Claim, p. 4; DE 8-1, p. 5].   Bounty Gain alleges that this was done at the direction of both Mr. Ho and Ms. Lancaster.   [Stmt. of Claim, p. 4; DE 8-1, p. 5].   Digital Domain ultimately filed for bankruptcy on September 11, 2012.   [Stmt. of Claim, p. 3; DE 8-1, p. 4].   The crux of Bounty Gain's claim in the FINRA arbitration is that UBSFS is liable to Bounty Gain for damages because it knowingly induced Bounty Gain to make a poor investment in a fledgling company. Bounty Gain briefly makes additional allegations that UBSFS made a false inducement to Bounty Gain to maintain its investment in DDMG long after the investment ceased being viable, that Bounty Gain was induced to retain its investments until the investments were virtually worthless, and that UBSFS failed to properly advise Bounty Gain to withdraw from its investment until such time as the investment was worthless.   [Stmt. of Claim, pp. 2-5; DE 8-1, pp. 3-6].   However, these additional allegations lack any factual specificity.

### Specific Allegations Set Forth in the FINRA Statement of Claim

Bounty Gain makes the following factual allegations in its FINRA Statement of Claim:

1. Bounty Gain alleges that "UBS" breached its duties to Bounty Gain in connection with its private investment in Digital Domain and "UBS"'s false inducement to Bounty Gain to convince Bounty Gain to maintain its investment in Digital Domain long after the investment ceased being viable.   [Stmt. of Claim, p. 2; DE 8-1, p. 3].

2. Bounty Gain alleges that unspecified individuals associated with both Digital Domain and "UBS" made false and misleading statements which induced people worldwide to

4

invest millions in Digital Domain from approximately 2009 through September 11, 2012. [Stmt. of Claim, p. 3; DE 8-1, p. 4].

3. In early 2011, Bounty Gain was approached by "UBS registered representative Peter Ho"[5] about investing in Digital Domain.   [Stmt. of Claim, p. 3; DE 8-1, p .4].   More specifically, Bounty Gain alleges that it "was solicited to participate in a private offering of unregistered shares of [Digital Domain] common stock with the promise that the private offering would be priced at a significant discount in price to a planned initial public offering to commence later that year."   [DE 1, p. 11].   Bounty Gain further alleges that UBSFS made assurances that Bounty Gain would see "a significant and immediate return on its investment following the IPO."   [Stmt. of Claim, p.3; DE 8-1, p. 4].

4. Bounty Gain alleges that "several members of UBS in Port Saint Lucie were working with Digital Domain Florida to raise capital and/or provide financial leverage to Digital Domain Florida and/or its principals."   [Stmt. of Claim, p. 3; DE 8-1, p. 4].

5. Bounty Gain alleges that UBSFS misrepresented Digital Domain's financial strength in order to induce Bounty Gain to invest in the company.   [Stmt. of Claim, pp. 3-4; DE 8-1, pp. 4-5].   Specifically, Bounty Gain alleges that individuals working on behalf of "UBS" provided documents such as corporate valuations and a draft registration statement to Bounty Gain in an effort to demonstrate the viability of its investment in Digital Domain.   [Stmt. of Claim, pp. 3-4; DE 8-1, pp. 4-5].   Bounty Gain alleges that they were given these documents at the direction of, "inter alia, UBS representatives

---

[5] See f.n. 3, *supra.*

Peter Ho, Roger Lam, and Terri Lancaster."  [Stmt. of Claim, p. 4; DE 8-1, p. 5]

6. Bounty Gain alleges that Peter Ho, Roger Lam, and Terri Lancaster acted in concert with Digital Domain's agents in soliciting Bounty Gain to invest its funds in Digital Domain. [Stmt. of Claim, p. 4; DE 8-1, p. 5].

7. Bounty Gain alleges that, in reliance on these representations about Digital Domain, Bounty Gain purchased 625,000 shares of Digital Domain stock at $8.00 per share, for a total investment of $5,000,000.00.  [Stmt. of Claim, p. 4; DE 8-1, p. 5].

8. Bounty Gain alleges that, at the direction of Peter Ho and Terri Lancaster, it then "wired its investment funds to an account at UBS Financial Services, Inc. RMA in South Florida for further credit to Digital Domain Institute, Inc."  [Stmt. of Claim, p.4; DE 8-1, p. 5].

9. Bounty Gain alleges that "[t]he statement made to [Bounty Gain] in connection with the July 27, 2011 Stock Purchase Agreement were untrue statements of material fact or omitted to state a material fact necessary to render such statements not false and misleading."  [Stmt. of Claim, p. 4; DE 8-1, p. 5].

10. Bounty Gain alleges that it was "induced to invest Five Million Dollars and to retain its investments until the investments were essentially worthless."  [Stmt. of Claim, p.4; DE 8-1, p. 5].

**Specific Violations of Law Alleged by Bounty Gain in the FINRA Arbitration**

1. Breach of Fiduciary Duty:

"UBS", Bounty Gain alleges, "assumed a level of fiduciary duty and was required to control [its] account and investment in [Digital Domain] in a manner which safeguarded [its] interests.  [UBS]'s representations, assurances, and promises—made by, inter alia,

Mr. Ho and Ms. Lancaster—created the condition precedent to [Bounty Gain]'s agreement to entrust its monies to [UBS]." [Stmt. of Claim, p.6; DE 8-1, p. 7]. "[UBS]'s recommendation and implementation of an unsuitable investment constitutes a breach of that duty to [Bounty Gain]." [Stmt. of Claim, p. 6; DE 8-1, p. 7].

2. <u>Negligence and Gross Negligence</u>:

Bounty Gain alleges that "[UBS] is responsible for the acts of its agents, including Mr. Ho and Ms. Lancaster . . . ." [Stmt. of Claim, p.7; DE 8-1, p. 8]. "[UBS] had a duty to disclose, fully and fairly, all material facts and risks associated with rendering investment advice. By failing to advise [Bounty Gain] of the true dangers that lurked behind the false offering documents [UBS] promoted to [Bounty Gain], [UBS] placed [Bounty Gain] within a foreseeable zone of risk of potentially catastrophic loss." [Stmt. of Claim, p. 7; DE 8-1, p. 8]. "Such conduct was in violation of [UBS]'s obligation to know the essential facts and circumstances of the products that it sells to its customers and only to make recommendations in accordance therewith." UBS "did not know or properly convey to [Bounty Gain] the essential facts and circumstances surrounding the [Digital Domain] investment, which caused [Bounty Gain] a huge economic loss." [Stmt. of Claim, p. 7; DE 8-1, p. 8].

3. <u>Breach of Contract</u>:

Bounty Gain alleges that UBSFS "breached its standard customer agreement." [Stmt. of Claim, pp. 7-8; DE 8-1, pp. 8-9].

4. <u>Failure to Supervise</u>:

Bounty Gain alleges that UBS "had a duty to properly supervise its agents, including Mr.

Ho and Ms. Lancaster", and that UBSFS "allowed Mr. Ho and Ms. Lancaster to withhold from Claimant vital information pertaining to the DDMG investment and misrepresent to Claimant the true nature of DDMG's undesirable financial condition."   [Stmt. of Claim, p. 8; DE 8-1, p. 9].

### Motion, Response, and Reply

According to the Motion for Preliminary Injunction ("Motion") filed by UBSFS, Bounty Gain is a corporation organized under the laws of the British Virgin Islands, and UBSFS is the only Respondent named in the FINRA Arbitration filed by Bounty Gain.   [DE 7, ¶ 3].   UBSFS maintains that Bounty Gain "does not have a customer agreement with UBSFS and is not a customer of UBSFS within the meaning of FINRA Rule 12200.   As a result, no basis exists to require UBSFS to arbitrate the matters raised by Bounty Gain in its Statement of Claim."   [DE 7, ¶ 5].

In further support of its argument, UBSFS points out that Mr. Ho is not registered with FINRA through UBSFS and was never an associated person of UBSFS.   [DE 7, p. 4]. Additionally, UBSFS states that UBS AG—a banking institution operating under the laws of Switzerland with an office in Hong Kong—is not a FINRA member.   [DE 7, pp. 4-5].   As for Ms. Lancaster, UBSFS maintains that Ms. Lancaster "did not have anything to do with Bounty Gain's investment in [Digital Domain]."   [DE 7, p. 5].   According to UBSFS, Ms. Lancaster was a sales assistant at the Stuart branch office of UBSFS, and "only provided wire instructions to DDMG and Digital Domain Institute, Inc. ("DDI") . . . because DDMG and DDI had accounts with UBSFS."   [DE 7, p. 5].   Ms. Lancaster "did not have any contact with Bounty Gain and did not provide wire instructions to Bounty Gain."   [DE 7, p. 5].   With respect to Mr. Lam,

UBSFS asserts that "Mr. Lam did not have any involvement with Bounty Gain's investment in [Digital Domain] during July and August 2011, . . . nor did he ever handle an account for Bounty Gain." [DE 7, p. 5]. According to UBSFS, Mr. Lam's only connection to Bounty Gain is that he handled an individual account for Mr. Kwok Chi Cheung for a period of time and Mr. Cheung apparently has some sort of connection to Bounty Gain. [DE 7, p. 5, n.1]. UBSFS explains that they have proven all of the factors required for a motion for preliminary injunction and that their motion must be granted. [DE 7, pp. 7-14].

In its Response, Bounty Gain presents a different version of the facts. However, the Court notes that some of these alleged facts are stated in an incomplete or inaccurate manner. For example, in its Memorandum in Opposition to UBSFS' Motion for Preliminary Injunction [DE 20], Bounty Gain asserts that it "was approached about investing in Digital Domain Media Group, Inc. ("DDMG")" [DE 20, p. 2], but does not state specifically who it was that allegedly made this approach. The record citation for this factual assertion is found at footnote 2 of docket entry 20, which refers the Court to the FINRA Statement of Claim at pages 2-3 [DE 20, p. 2, n.2]. When the Court then goes to the FINRA Statement of Claim at pages 2-3 [DE 8-1, pp. 3-4], it says that "[i]n or about early 2011, Claimant was approached by UBS Registered Representative Peter Ho about investing in DDMG stock despite the fact that DDMG was a floundering company . . . ." [DE 8-1, pp. 3-4]. The problem with the above-referenced assertion by Bounty Gain is that the evidence in this case is crystal clear that Peter Ho never worked for UBSFS, was never a registered representative of UBSFS, and was never an associated person or agent of UBSFS. Rather, Peter Ho worked for UBS AG, a Swiss bank distinct from UBSFS—and a non-FINRA member. Therefore, a primary portion of the factual

basis for Bounty Gain's Statement of Claim is simply not true.

Further, Bounty Gain asserts in its Memorandum in Opposition that it "was solicited to participate in a private offering of unregistered shares of DDMG common stock with the promise that the private offering would be priced at a significant discount in price to a planned initial public offering ("IPO")," but Bounty Gain does not state who it was who allegedly solicited Bounty Gain or who made the promise to Bounty Gain.   [DE 20, pp. 2-3].   The record citation for this factual assertion is contained in footnote 3 of docket entry 20 and refers the Court to page 3 of the FINRA Statement of Claim [DE 20, p. 3, n.3]; however, the Statement of Claim is likewise deficient in that it also does not specify who allegedly made this solicitation and promise.   [Stmt. of Claim, p. 3; DE 8-1, p. 4].

Bounty Gain's Memorandum in Opposition also refers to UBSFS, UBS International, and UBS AG as "UBS Related Entities" [DE 20, p. 3] even though UBS AG is not even a FINRA member. Upon reading these allegations by Bounty Gain, the Court queried Bounty Gain's counsel as to whether Bounty Gain was alleging an alter ego or similar theory as to these distinct entities, and defense counsel stated that he was not making such an argument [DE 31, p. 84, lines 10-14].   These confusing and vague assertions continue where Bounty Gain asserts in its Memorandum in Opposition that it "was also informed" of certain facts listed in paragraphs (a) through (f) on pages 3-4 of its memorandum, yet it is not stated who allegedly informed Bounty Gain of these facts.   [DE 20, pp. 3-4].   The record citations for these factual assertions are contained in footnotes 6 through 11 of docket entry 20, which refers the Court to paragraphs 7 through 9 of the declaration of Mr. Cheung [DE 21, pp. 3-4, n.6-11].   However, a review of paragraph 7 of Mr. Cheung's declaration [DE 21] shows he only states that Mr. Ho (who was

never employed by UBSFS) informed Bounty Gain of certain of this information.   And a review of paragraphs 8-9 of Mr. Cheung's declaration shows that those paragraphs do not state who allegedly informed Bounty Gain of these asserted facts.   [DE 21, ¶ 8-9].

Bounty Gain asserts that after entering into the stock purchase agreement, Bounty Gain wire transferred $5,000,000 in funds to the attention of Terri Lancaster, who Bounty Gain alleges was "a UBS-FS registered representative working in UBS-FS's Stuart, Florida office."   [DE 20, p. 4].   However, in an Affidavit of Terri Lancaster, she states that she has worked for UBSFS since September 2007 as a "Senior Registered Client Service Associate" and not as a financial advisor.   [DE 11].   Ms. Lancaster also states that she never dealt with Bounty Gain and never heard of Bounty Gain before she read their Statement of Claim.   [DE 11].   Bounty Gain asserts that the $5,000,000 in funds it wired was to be placed "in an account at UBS-FS's Stuart, Florida office for further credit to Digital Domain Institute, Inc. ("DDI") because that is how Bounty Gain was instructed by UBS-FS representatives to submit its funds."   [DE 20, p. 4].   The record citation for this assertion is contained in footnote 14 of docket entry 20, which refers the Court to the Statement of Claim at page 4.   According to the Statement of Claim at page 4, Bounty Gain was so instructed by Peter Ho and Terri Lancaster.   The problem with the Peter Ho portion of this assertion is again that Peter Ho never worked for UBSFS.   As to that portion of the assertion regarding Ms. Lancaster, she refutes the assertion in her affidavit where she states that she never dealt with Bounty Gain.   [DE 11].   Bounty Gain also asserts in its Memorandum in Opposition that it "was instructed that it was required to 'have an account with UBS for settlement' of Bounty Gain's investment in DDMG," but it is not stated who specifically so instructed Bounty Gain.   [DE 20, p. 4].   The record citation for this assertion is

11

found at footnote 15 of docket entry 20, which refers to paragraph 8 of the Cheung Declaration; yet, when the Court goes to paragraph 8 of the Cheung Declaration, no further specificity is given.   [DE 21, ¶ 8].

Bounty Gain also asserts that, in mid-November, 2011, a few months after it made its investment, "the UBS Related Entities instructed Bounty Gain that it needed to have its DDI shares converted into DDMG shares, and Bounty Gain acquiesced to those instructions."   [DE 20, p. 4].   The problem with this assertion is two-fold.   First, earlier in their Memorandum in Opposition, Bounty Gain defined the "UBS Related Entities" as "UBS-FS . . . UBS International and UBS AG" [DE 20, p.3], despite the fact that UBSFS and UBS AG are distinct companies and UBS AG is not even a FINRA member.   The lumping together of two distinct companies, one of which (UBSFS) is a New Jersey company and FINRA member, while the other (UBS AG) is a Swiss bank and not a FINRA member, unnecessarily causes confusion and injects inaccuracies in Bounty Gain's assertion of facts.   Second, the record citation for this assertion is found at page 4, footnote 16 of docket entry 20, which refers the Court to paragraph 7 of the Declaration of Ms. Chan.   But that paragraph of Ms. Chan's declaration merely states that "Bounty Gain was instructed" and does not state who allegedly gave the instruction.   [DE 22, p. 2].

Bounty Gain's Memorandum in Opposition goes on to state that "Bounty Gain was told that Mr. Lam (the UBS-FS registered representative in Hong Kong with whom Bounty Gain was already familiar) would take care of it [referring to the conversion of Digital Domain shares] for Bounty Gain."   [DE 20, p. 5].   However, there are at least two problems with this assertion. First, the record citation for the factual assertion that Bounty Gain was told that Roger Lam

12

would convert the Digital Domain shares as needed prior to the IPO is found at page 5, footnote 18 of docket entry 20, which refers the Court to paragraph 12 of the Cheung Declaration and paragraph 8 of the Chan Declaration. [DE 20, p. 5, n.18]. But a review of those two paragraphs of the two respective declarations show that they merely state that "Bounty Gain was told"—they do not state who allegedly told Bounty Gain this fact. [DE 21, ¶ 12; DE 22, ¶ 8]. Second, this allegation is not specifically made in the Statement of Claim filed by Bounty Gain in the FINRA arbitration. Roger Lam is only mentioned once in the Statement of Claim and that is in reference to his alleged role in soliciting the investment from Bounty Gain. [Stmt. of Claim, p. 4; DE 8-1, p. 5]. Mr. Lam is not mentioned at all in the Violations of Law section of the Statement of Claim which asserts the claims against UBSFS.

These and other vague, inaccurate, or conflicting factual allegations made in the Statement of Claim [DE 8-1], Bounty Gain's Memorandum in Opposition [DE 20] and the declarations of Mr. Cheung [DE 21] and Ms. Chan [DE 22], have made it extremely difficult for the Court to ascertain the true nature of Bounty Gain's factual assertions and argument. Because of this, the Court has expended a great deal of time and effort in reviewing the record in an effort to carefully consider and evaluate the factual assertions made by Bounty Gain in this case.

According to Bounty Gain's Memorandum in Opposition, in May 2012, it requested that its Digital Domain shares be delivered to Bounty Gain's UBS account so they could be sold immediately. [DE 20, p. 5]. Bounty Gain alleges that in the course of multiple written exchanges with several individuals including Ed Lunsford, Roger Lam, Charles Yiu Wing Chiu, Brian Sullivan, and Elaine Cheng, Bounty Gain was instructed to have Mr. Lam request the

13

transfer.  [DE 20, p. 5].   According to Bounty Gain, UBSFS did not complete the transfer until late August of 2012; by that time, Digital Doman was on the verge of filing for bankruptcy, and its stock held very little market value.  [DE 20, p. 6].   The Court notes that none of these specific allegations about Mr. Lam's supposed negligence or other misconduct regarding the transfer of the shares were made in the Statement of Claim filed by Bounty Gain in the FINRA arbitration, although Bounty Gain did make a few brief general allegations to the effect that Bounty Gain was induced by UBSFS to retain or maintain its investment in DDMG and not withdraw from the investment until it became worthless.

Bounty Gain admits that it did not have a direct written arbitration agreement with UBSFS, but argues that the absence of a direct written arbitration agreement with UBSFS does not, by itself, prevent Bounty Gain from establishing FINRA jurisdiction.  [DE 20, p. 7]. Bounty Gain maintains that, because UBSFS is a FINRA member, it is thus "subject to the FINRA Code of Arbitration Procedure (the "FINRA Code"), which itself serves as an agreement in writing under the Federal Arbitration Act that binds UBSFS to arbitrate Bounty Gain's claim in the FINRA arbitration."  [DE 20, p. 8].  Bounty Gain also asserts that it is, in fact, a customer of UBSFS; in support of this assertion, Bounty Gain asserts that it had numerous business dealings with Roger Lam in connection with its purchase of Digital Domain shares. However, the Court saw no evidence of the alleged involvement by Roger Lam in connection with Bounty Gain's purchase of the Digital Domain shares; rather, the evidence reflected that the investment was solicited by Peter Ho who was never employed by or associated with UBSFS. Bounty Gain also asserts that it engaged in communications with various other registered representatives of UBSFS, including Brian Sullivan, concerning Bounty Gain's DDMG

14

investment [DE 20, p. 11].[6]   Finally, Bounty Gain argues that it is entitled to pursue FINRA arbitration because its claims arise out of, and in connection with, UBSFS' business.   [DE 20, pp. 11-12].   Bounty Gain further argues that UBSFS has not proven all of the elements necessary to compel this Court to impose a preliminary injunction.   [DE 20, pp. 14-16].

In its Reply, UBSFS takes issue with several factual discrepancies that, according to UBSFS, appear throughout the record.   First, UBSFS points out that, in its Answer and Affirmative Defenses to Complaint for Declaratory Judgment and Injunctive Relief [DE 18], Bounty Gain admits that UBS AG is not a FINRA member.   Second, in the Declaration of Kwok Chi Cheung, it is acknowledged that Peter Ho was the individual who allegedly solicited and induced Bounty Gain to invest in Digital Domain.   [DE 21, ¶¶ 6-7].   Third, in the Declaration of Raymond Robertello [DE 13], it is established that Peter Ho "was not and is not an associated person with UBSFS."   [DE 13, ¶¶ 4-5].   Fourth, UBSFS argues that the declarations submitted by Bounty Gain establish that Peter Ho was employed by UBS AG, and not by UBSFS.   [DE 23, p. 3].   Fifth, UBSFS alleges that Bounty Gain does not dispute the fact that Bounty Gain never actually had an account with UBSFS.   [DE 23, p. 4].   Sixth, UBSFS challenges the credibility of the Declarations of both Kwok Chi Cheung and Kittie Chan; in their Declarations, both Mr. Cheung and Ms. Chan affirm that they read the Statement of Claim and that the factual allegations set forth therein are true.   [DE 23, p. 7; DE 21, ¶ 4; DE

---

[6] As it turns out, this assertion by Bounty Gain that it had communications with a UBSFS registered representative by the name of Brian Sullivan is demonstrably false, as discussed in more detail later in this Report and Recommendation.   In fact, despite assertions by Defendant's counsel [DE 20, p. 11] and a Declaration of Mr. Cheung [DE 21, para. 15] asserting that Bounty Gain engaged in communications with UBSFS representative Brian Sullivan, the true fact is that the Brian Sullivan mentioned in the emails was an attorney for Digital Domain, not a UBSFS representative.

22, ¶ 4]. However, the Statement of Claim incorrectly states that Peter Ho is an associated person of UBSFS. Mr. Cheung and Ms. Chan both contradict the Statement of Claim and state that Mr. Ho is an employee of UBS AG. [DE 21, ¶ 6; DE 22, ¶ 5]. Seventh, both the Declarations of Mr. Cheung and Ms. Chan state their belief that Bounty Gain was a customer of Roger Lam in connection with allegations relating to the re-registration and transfer of Digital Domain shares. However, these allegations are absent from the Statement of Claim. [DE 23, p. 7]. Eighth, in her Declaration, Ms. Chan refers to "Bounty Gain's UBS account." [DE 22, ¶ 9]. However, UBSFS points out that Ms. Chan fails to attach any documents to establish the existence of such an account. [DE 23, pp. 8-9]. Ninth, Bounty Gain takes issue with the fact that, although Ms. Chan's Declaration refers to "numerous written communications" written or received by "UBS-FS representatives," including Mr. Lam, she fails to substantiate these statements with any documents. Tenth, UBSFS finds fault with Ms. Chan's statement relating to her "understanding" regarding Mr. Lam's actions as a UBSFS registered representative for Bounty Gain; UBSFS argues that this statement does not constitute evidence because it is not based on personal knowledge. [DE 23, p. 9].

## Evidentiary Hearing

The undersigned held an evidentiary hearing on April 17, 2015. [DE 29]. At the evidentiary hearing, the undersigned admitted Plaintiff's Composite Exhibit 1, Defendant's Exhibit 1, and Plaintiff's Exhibit 2 into evidence. Plaintiff's Composite Exhibit 1 is a compilation of affidavits in support of UBSFS's position. Defendant's Exhibit 1 is the Declaration of David C. Silver in Opposition to Plaintiff's Motion for Preliminary Injunction [DE 28], along with Exhibits A-F. Plaintiff's Exhibit 2 is the declaration of Terri Lancaster in

support of UBSFS' Motion for Preliminary Injunction [DE 11]. The documentary evidence admitted at the April 17, 2015 hearing is discussed in greater detail below.

**Documentary Evidence**

**Plaintiff's Composite Exhibit 1**

1. ***Declaration of Raymond Robertello***

    In his declaration [DE13], Mr. Robertello states that he manages the Registrations Department at UBS Financial Services Inc. ("UBSFS"). Mr. Robertello states that he reviewed "the books and records of UBSFS, including a review of records relating to individuals employed by UBS International ("UBSI"), which merged into UBSFS, during December 2009." Mr. Robertello states that, after a thorough review of the books and records of UBSFS and UBSI, he affirms that Mr. Kwan Peter Ho was never registered with UBSFS or UBSI, and that Mr. Ho was never an associated person of UBSFS or UBSI.

2. ***Declaration of Maureen Millett***

    In her declaration [DE12], Ms. Millett stated that she is an Executive Director in charge of the Client On-Boarding Department at UBSFS. Ms. Millett reviewed the books and records of UBSFS and UBSI to determine whether Bounty Gain Enterprises, Inc. ever had an account with UBSFS or UBSI and whether UBSFS and Bounty Gain ever entered into a customer agreement. Ms. Millett affirmed that Bounty Gain never had an account with UBSFS or UBSI, and that Bounty Gain never had a customer agreement with UBSFS.

3. *Declaration of Cheryl Grassmann*

In her declaration [DE 9], Ms. Grassmann states that she is the Assistant Corporate Secretary of UBS Americas, Inc., which is a wholly-owned subsidiary of UBS AG.   Ms. Grassmann affirmed that UBS AG is not a FINRA member.   Rather, UBS AG is a banking institution located in and operating under the law of Switzerland.   Furthermore, UBS AG has a branch located in Hong Kong.

4. *Declaration of Roger Lam*

In his declaration [DE 10], Mr. Lam states the following:

- From May 2008 through January 2010, Mr. Lam was registered with UBSI in Hong Kong.

- From January 2010 until December 2012, Mr. Lam was registered with and worked for UBSFS.

- Mr. Lam has worked for UBS AG since December 2012.

- Mr. Lam states that, to best of his recollection, around February 2009, he was involved with opening an account at UBSI for an individual named Kwok Chi Cheung (a/k/a Cliff Cheung).

- Mr. Lam was never involved with opening, handling or servicing an account at UBSFS or UBSI for Bounty Gain.

- Mr. Lam reviewed the Statement of Claim filed by Bounty Gain; Mr. Lam did not have any involvement with any investment by Bounty Gain in Digital Domain Media Group or Digital Domain Institute.

- Mr. Lam has no knowledge of the investment in Digital Domain made by Bounty

Gain in July or August 2011, as alleged in the Statement of Claim.

5. *Declaration of Kwok Chi Cheung*

In his declaration [DE 20-1] Mr. Cheung states the following:

- All of the factual allegations contained within the Statement of Claim, the Bounty Gain Memo of Law, and the Counterclaim are true and correct.
- Mr. Cheung is one of the principals of Bounty Gain.
- In early 2011, Bounty Gain was approached by Peter Ho of UBS AG about investing in Digital Domain Media Group, Inc. ("DDMG"), and Bounty Gain did invest funds in DDMG.
- In mid-November, 2011—before the effective date of the DDMG IPO—Bounty Gain was instructed that it needed to have its DDI shares converted to DDMG shares.   Bounty Gain acquiesced to these instructions.
- Bounty Gain was told that Roger Lam would take care of the conversion of the Digital Domain shares.
- In May 2012, Bounty Gain requested that its Digital Domain shares be delivered to Bounty Gain's UBS account so they could be sold immediately; Bounty Gain was instructed to have Mr. Lam request the transfer.
- UBSFS did not successfully effectuate the transfer of Digital Domain shares until August of 2012.
- Bounty Gain engaged in numerous business dealings with Mr. Lam in connection with Bounty Gain's investment in DDMG during Mr. Lam's tenure as a registered representative of UBSFS.

19

- Bounty Gain had a relationship with Mr. Lam and interacted with him with the full expectation and understanding that Mr. Lam was acting as its UBSFS registered representative.

- Through the course of communications with several individuals, including Ed Lunsford (Digital Domain Media Group's Senior Vice President and General Counsel), Roger Lam (the UBSFS registered representative working out of UBSFS' office in Hong King), Charles Yiu Wing Chiu (another USBFS registered representative working out of UBSFS' Hong Kong office), Brian Sullivan (a UBSFS First Vice President and registered representative in UBSFS' office in Wellesley, MA), and Elaine Cheng (a UBSFS registered representative in UBSFS' office in New York, NY), Bounty Gain was instructed to have Mr. Lam request the transfer of the Digital Domain shares.

- Mr. Lam was informed of, and was involved with, Bounty Gain's investment with DDMG.

## 6. *Declaration of Kittie Chan*

In her declaration [DE 20-2], Ms. Chan states the following:

- Ms. Chan is an employee of Bounty Gain.

- All of the factual allegations contained within the Statement of Claim, the Bounty Gain Memo of Law, and the Counterclaim are true and correct.

- In addition to echoing many of the statements set forth in Mr. Cheung's affidavit, Ms. Chan states that, in her capacity as a representative of Bounty Gain, she engaged in, and was privy to, numerous written communications on which Mr.

Lam was either an author or a recipient discussing Bounty Gain's investment in Digital Domain.

- Ms. Chan, in her capacity as a representative of Bounty Gain, was engaged in, and was privy to, numerous written communications on which other UBSFS representatives were either authors or recipients discussing Bounty Gain's investment in Digital Domain.

- Throughout Bounty Gain's involvement with Digital Domain, it was Ms. Chan's understanding that Mr. Lam was acting as Bounty Gain's UBSFS registered representative.

## 7. *Declaration of Brian Sullivan*

In his declaration [DE 24-1], Mr. Sullivan states the following:

- He works for UBSFS at a branch office in Wellesley, Massachusetts, as a financial advisor, and has worked in that capacity since March of 2000.

- He has reviewed the declarations of Ms. Chan and Mr. Cheung; he had never heard of Bounty Gain Enterprises, Ms. Chan, or Mr. Cheung until reading their declarations.

- He has never dealt with anyone affiliated with Bounty Gain.

- He had no involvement with Bounty Gain's investment in Digital Domain Media Group, Inc. or Digital Domain Institute, and was not aware of the investment until he read the declarations of Ms. Chan and Mr. Cheung.

- He never provided investment advice to Bounty Gain or entered an order to buy or sell securities for Bounty Gain.

8. **Second Declaration of Roger Lam**

- In his second declaration [DE 26], Mr. Lam explains that he has reviewed the declarations of Ms. Chan and Mr. Cheung, and reiterates that he did not have any involvement with any investment by Bounty Gain in Digital Domain.

- Mr. Lam also stated that he only handled a personal account at UBSFS for Mr. Cheung, and that account was solely in his name.

- Mr. Lam reiterates that he did not open or handle an account for Bounty Gain.

**Defendant's Exhibit 1**:

1. *Exhibit A*:

- Exhibit A is an e-mail message dated Wednesday, July 13, 2011, which was sent from peter.ho@ubs.com to cliffc@fareast-group.com and cliffc@kingdomo.com, with the subject line "Digital Domain Group."

- This email message contains a description of the Digital Domain company and also states the valuation of the company, as well as other figures.   The email concludes with the following statement:   "Must have account with UBS for settlement."

2. *Exhibit B*:

- Exhibit B is an e-mail exchange among many authors and recipients concluding with a message dated Monday, November 14, 2011, which was sent from peter.ho@ubs.com       to       kittiechan@fareast-group.com       and       copied       to cliffc@fareast-group.com, with the subject line "shares."

- In the final email exchange, Peter Ho asks Kittie Chan to call "Ms. Natalie"

urgently regarding the conversion of Digitial Domain shares.   Peter Ho states "we have Roger Lam to handle."

3. ***Exhibit C***:

- Exhibit C is an e-mail exchange among many authors and recipients concluding with a message dated Tuesday, June 5, 2012, which was sent from Natalie Frie (laushaogee@yahoo.com.sg) to roger.lam@ubs.com and copied to sanfrancisco@macau.ctm.net, cliffc@fareast-group.com, pphomail@gmail.com, elaine.cheng@ubs.com, and charles.chiu@ubs.com with the subject line "Delivery of DDMG shares."

4. ***Exhibit D***:

- Exhibit D is a copy of a November 3, 2014 letter from Scott L. Silver, Esq. of Silver Law Group to Bennett Falk, Esq. of Bressler, Amery & Ross, P.C. which enclosed the July 13, 2011 email from Peter Ho reference above as "Exhibit A."

5. ***Exhibit E***:

- Exhibit E is a copy of a January 8, 2015 letter from Scott L. Silver, Esq. of Silver Law Group to Bennett Falk, Esq. of Bressler, Amery & Ross, P.C.

6. ***Exhibit F***:

- Exhibit F is a copy of a January 23, 2015 letter from Alex J. Sabo, Esq. of Bressler, Amery & Ross, P.C. to Scott L. Silver, Esq. and David C. Silver, Esq. of Silver Law Group.

**Plaintiff's Exhibit 2**:

In her declaration [DE 11], Terri Lancaster states the following:

- She works for UBSFS as a Senior Registered Client Service Associate at a branch office in Stuart, Florida, and has worked for UBSFS since 2007.

- She has reviewed the Statement of Claim filed by Bounty Gain in this case; she has never dealt with anyone affiliated with Bounty Gain.

- She has no knowledge regarding any investment by Bounty Gain in Digital Domain, and did not know of any such investment until she read the Statement of Claim.

- She provided wire transfer instructions to Digital Domain Media Group and Digital Domain Institute, Inc.; however, she never provided wire transfer instructions to Bounty Gain or anyone affiliated with Bounty Gain.

- She never provided wire transfer instructions to Peter Ho or Roger Lam, and had never heard of either individual prior to the filing of the Statement of Claim by Bounty Gain.

**Third Declaration of Counsel in Support of Plaintiff's Motion for Preliminary Injunction**

Following the April 17, 2015 evidentiary hearing, UBSFS submitted its Third Declaration of Counsel in Support of Plaintiff's Motion for Preliminary Injunction [DE 32-1]. In the declaration, Alex Sabo, Esq., counsel for UBSFS, stated that he reviewed several registration statements from the Securities and Exchange Commission pertaining to Bounty Gain Enterprises.  Mr. Sabo states that the first page of all of the documents he reviewed references Brian A. Sullivan of the law firm of Sullivan and Triggs, LLP, located in Santa Monica, California.

24

## Discussion

A preliminary injunction may be issued pursuant to Federal Rule of Civil Procedure 65 if the movant demonstrates that

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).   While the decision to grant or deny a preliminary injunction is within the discretion of the district court, a preliminary injunction is considered to be an "extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)).   "In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction."   *Levi Strauss & Co. v. Sunrise Intern'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). *See also Pronman v. Styles*, 2014 WL 5325207 (S.D. Fla. 2014).

FINRA Rule 12100(a) and (r) states that an "associated person" includes

> [a] sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA."

FINRA Rule 12200 provides in relevant part that arbitration is required when "[r]equested by the customer," and "[t]he dispute is between a customer and a member or associated person of a

member" and "arises in connection with the business activities of the member or the associated person." "Hence, an investor can compel a FINRA member to arbitrate a claim, even when no written arbitration agreement exists, provided that the investor demonstrates that the dispute (1) is between either a customer and a member or a customer and a member's associated person, and (2) arises in connection with the business activities of the member or its associated person." *Morgan Keegan & Co. v. Shadburn,* 829 F.Supp.2d 1141, 1147 (M.D. Ala. 2011); *Multi-Financial Secs. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004); *MONY Secs. Corp. v. Bornstein*, 390 F.3d 1340 (11th Cir. 2004). *See also Pictet Overseas, Inc. v. Helvetia Trust,* U.S. District Court, Southern District of Florida, case no. 13-81088-CIV-Marra-Matthewman [DE 44; 49].

UBSFS argues that it is not required to submit to a FINRA arbitration for the following reasons: (1) UBSFS and Bounty Gain never entered into an agreement to arbitrate and (2) Bounty Gain is not a "customer" of UBSFS. UBSFS also argues that it has satisfied all of the elements for a preliminary injunction: (1) UBSFS has a substantial likelihood of success on the merits; (2) UBSFS will suffer irreparable harm if Bounty Gain is not enjoined from proceeding with the arbitration; (3) the balance of the equities favors UBSFS; and (4) issuing an injunction serves the public interest.

## Analysis

This case is factually intensive, hence the Court's laborious recitation in the previous sections of this Report and Recommendation of the Declarations submitted by the parties and the facts asserted by the parties. After carefully reviewing all the evidence in this case, the Court has distilled the following key factual findings.

26

A. *Key Factual Findings*

The following facts are central to this Court's findings, several of which are undisputed:

- Bounty Gain never had an account with UBSFS.

- Bounty Gain never had a written agreement to arbitrate with UBSFS.

- Peter Ho was a UBS AG employee, not a UBSFS representative or employee.

- Peter Ho solicited the Digital Domain investments at issue in this case.

- Peter Ho was never an associated person, employee or agent of UBSFS.

- Bounty Gain only had an account with UBS AG.

- The $5,000,000.00 in funds used for the purchase of Digital Domain shares came from Sun Hung Kai investments, an entity unrelated to UBSFS.   This investment was made directly with Digital Domain.

- Roger Lam's only connection to the Digital Domain investment related to the removal of a restrictive legend on the Digital Domain shares [DE 33, p. 2], or perhaps a request for assistance to convert Digital Domain shares.   Roger Lam played no role in Bounty Gain's initial investment in Digital Domain.

- There is no evidence that Bounty Gain compensated Roger Lam for any service.

- There is no evidence that Roger Lam, on behalf of Bounty Gain, ever actually removed any restrictive legend on the Digital Domain shares or actually converted Digital Domain shares.

- Although Kwok Chi Cheung, a principal of Bounty Gain, did have an individual account at UBSFS, handled by Roger Lam, Bounty Gain did not have any account at UBSFS.

27

- ▪ Roger Lam never handled any account for Bounty Gain while he was employed by UBSFS.

- ▪ Terri Lancaster had no involvement with the purchase of Digital Domain shares; she did not provide any services to Bounty Gain.

- ▪ Bounty Gain produced no evidence that it purchased any goods or services from UBSFS.

**B.  *Whether UBSFS and Bounty Gain Entered Into an Agreement to Arbitrate***

It is undisputed that UBSFS and Bounty Gain did *not* have a written arbitration agreement. [*See* DE 31, p. 4].

**C.  *Whether Bounty Gain Is Otherwise a Customer of UBSFS***

FINRA Rule 12200 states that parties are required to arbitrate under the Code if (1) arbitration is either required by a written agreement or requested by the customer, (2) the dispute is between a customer and member or customer and associated person of the member, and (3) "[t]he dispute arises in connection with the business activities of the member or the associated person . . . ."   In other words, Bounty Gain is required to show both that it is a customer of UBSFS or an associated person of UBSFS and that the dispute arose in connection with business activities of UBSFS or the associated person of UBSFS.   Thus, if Bounty Gain cannot first prove that it is a customer of UBSFS or an associated person of UBSFS by purchasing a commodity or service from a FINRA member or an associated person of a FINRA member, the Court need not even reach the question whether the dispute arose in connection with the business activities of UBSFS or an associated person of UBSFS.   *See Wheat, First Sec., Inc., v. Green*, 993 F.2d 814, 821-21 (11th Cir. 1993) (stating "[b]ecause we find that the Appellants were not

28

Wheat First customers for purposes of the NASD code, we do not reach the question of whether the Appellants' claims arose 'in connection with the business of' Wheat First . . . .").

The NASD expressly defines "customer" as anyone who is not a broker or dealer.  *See* Rule 0120(g).   The FINRA Rules give additional context to the term "customer."   As explained by the Fourth Circuit in a recent case, under the FINRA Rules, "arbitrable disputes must arise in connection with the 'business activities' of the FINRA member, thus suggesting that for a person to obtain arbitration, the person must be a customer with respect to the FINRA member's business activities.  *See* FINRA Rule 12200."   *UBS Fin. Servs. Inc. v. Carilion Clinic*, 706 F.3d 319, 325 (4th Cir. 2013).   According to the Fourth Circuit, the FINRA Rules also suggest that the business activities must involve investment banking or securities business pursuant to Rule 12100(r).  *Id.*   Thus, the Fourth Circuit has concluded that the term "customer" in Rule 12200 refers to "one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are covered by FINRA's regulation, namely the activities of investment banking and the securities business."  *Id.*   This Court agrees with the Fourth Circuit's analysis and believes that such a definition of "customer" comports with the intent behind the FINRA Rules.

The core issue to decide in this case is whether Bounty Gain was a customer of UBSFS or an associated person of UBSFS.   The Court finds that it is clear that Peter Ho was the individual who engaged in the solicitation regarding the $5,000,000 investment in Digital Domain.   It is now undisputed that Peter Ho never worked for UBSFS and was never an associated person of UBSFS, despite Bounty Gain's inaccurate statements to the contrary in its Statement of Claim.   Therefore, there is zero evidence to support Bounty Gain's argument that

it purchased a commodity or service from UBSFS or an associated person of UBSFS.   The Court does not understand how the alleged inducement made by Peter Ho of UBS AG (a non-FINRA member) to purchase shares of stock of Digital Domain can give rise to an arbitration claim against UBSFS (a FINRA member).   Bounty Gain's position and argument is flawed at its core and Bounty Gain attempts to support its position by declarations and papers which contain some inaccurate, vague, and conflicting assertions.

In this regard, the FINRA Statement of Claim contains the false statement that Peter Ho was a registered representative and/or agent of UBSFS. [Stmt. of Claim, pp. 3-4; pp. 6-8; DE 8-1, pp. 4-5; pp. 7-9]. The declarations of Mr. Cheung and Ms. Chan both adopt this false statement when they declare that all the factual allegations in the FINRA Statement of Claim are true and correct.   [DE 21, p. 2, ¶ 4; DE 22, p. 2, ¶ 4].   Then, inconsistently, the two declarations go on to state that Peter Ho was with UBS AG's office in Hong Kong.   [DE 21, p. 2, ¶ 6; DE 22, p. 2, ¶ 5].   Further, the declaration of Mr. Cheung contains an additional false statement, that is, the allegation that Bounty Gain had multiple written exchanges with several individuals including a UBSFS First Vice President and registered representative by the name of Brian Sullivan in UBSFS's office in Wellesley, Massachusetts [DE 21, p. 4, ¶ 15], when it is clear from the evidence that the Brian Sullivan referenced in the emails cited by Bounty Gain is a California attorney for Digital Domain—not an employee of UBSFS.   *See* DE 33, pp. 5-6; DE 32-1.

The Court is very troubled by the fact that the affidavit of Mr. Cheung [DE 21, ¶ 15] contains a clearly false statement which misrepresents who the Brian Sullivan in the emails really was, that is, it asserts that the Brian Sullivan in the emails was a UBSFS representative

when, in fact, he was really a California attorney for Digital Domain.    This misrepresentation is also contained in Bounty Gain's memorandum in opposition to UBSFS' motion for preliminary injunction [DE 20, p. 5], which both Mr. Cheung and Ms. Chan state in their respective declarations is true and correct.    [DE 21, p. 2, ¶ 4; DE 22, p. 2 ¶ 4].    These misrepresentations do not appear to the Court to be some sort of innocent mistake; rather, they appear to be part of Bounty Gain's effort to falsely claim involvement by someone—anyone—at UBSFS in order to support its FINRA arbitration claim against UBSFS. These misrepresentations call into serious question the veracity of Mr. Cheung's declaration, Ms. Chan's declaration, the Memorandum in Opposition, and Bounty Gain's position as to the pending Motion, and leaves the Court to wonder how such false information ever made it into Mr. Cheung's declaration and memorandum filed with the Court.[7]    It appears that Bounty Gain is improperly attempting to stretch the truth to try and create a relationship between itself and UBSFS or an associated

---

[7] The Court notes that Bounty Gain's Supplemental Memorandum [DE 36], filed subsequent to the evidentiary hearing, deletes the reference to Brian Sullivan as a UBSFS registered representative when it states the name of the several individuals allegedly involved in the "multiple written exchanges."    [DE 36, p. 6; p. 9, n.13].    Bounty Gain does not attempt to explain how that false assertion made its way into Bounty Gain's Memorandum in Opposition [DE 20, p. 5] or into Mr. Cheung's Declaration [DE 21, para. 15], nor has Bounty Gain taken any steps to correct Mr. Cheung's Declaration which still remains of record in this case.    Bounty Gain states in its Supplemental Memorandum that there is "some confusion" whether Brian Sullivan is a UBSFS registered representative or a private transactional attorney.    [DE 36, p. 9, n.13].    The Court sees no basis for such "confusion" and finds that it is clear that the Brian Sullivan mentioned in the email correspondence admitted by Bounty Gain is, in fact, a private transactional attorney with no relationship to UBSFS.    The Supplemental Memorandum filed by UBSFS suggests that "either Mr. Cheung or someone acting on his behalf took Mr. Sullivan's name and ran it through the FINRA CRD system and found Brian Sullivan, an associated person of USBFS in Wellesley, Massachusetts, and then untruthfully swore that he had communications with him."    [DE 33, p. 6, n.3].    For purposes of the instant Motion, the Court does not need to ascertain how the false allegation regarding Brian Sullivan's association with UBSFS made it into Bounty Gain's argument and evidence.    However, it is clear to the Court that the allegation is false and negatively affects the credibility of Bounty Gain as to the pending Motion.

person of UBSFS where, in reality, none exists.

As to whether Bounty Gain purchased a service or commodity from UBSFS, the only evidence that Bounty Gain submits (other than the affidavits of Mr. Cheung and Ms. Chan) are emails that Roger Lam either received or was copied on regarding the removal of a restrictive legend on Digital Domain shares or a request that he convert some person or entity's shares of Digital Domain.   But Roger Lam never handled any account for Bounty Gain; rather, he merely handled a personal account for Mr. Cheung, one of the principals of Bounty Gain.   Simply because Mr. Lam handled an account for an individual (Mr. Cheung) who also happened to be one of the principals of Bounty Gain, does not mean that Roger Lam handled an account for Bounty Gain.   Nor is there any evidence that Roger Lam, on behalf of Bounty Gain, removed any restrictive legend on Digital Domain shares or converted any Digital Domain shares.

The Court has carefully reviewed the evidence as to Roger Lam's alleged role in the claims made by Bounty Gain in the FINRA arbitration.   Specifically, the Court has carefully reviewed the emails submitted by Bounty Gain [DE 28; Defendant's Ex. 1] and the FINRA Statement of Claim.[8]   [DE 1, Ex. A, pp. 8-17].   First, it is noteworthy that the FINRA Statement of Claim only mentions Roger Lam once, and that is solely in regard to the solicitation of Bounty Gain to invest in Digital Domain.   [Stmt. of Claim, p. 4; DE 8-1, p. 5].   The Statement of Claim does not specifically allege any involvement by Roger Lam in the alleged removal of a restrictive legend on Digital Domain shares of stock or in the conversion of any such shares.   Second, the section entitled "Violations of Law" in the Statement of Claim does not even mention Roger Lam; rather, that section and the specific claims made in that section

---

[8] The documents referenced in the emails were not included as exhibits.

refer only to Mr. Ho and Ms. Lancaster.   [Stmt. of Claim, pp. 5-8; DE 8-1, pp. 6-9].   Third, the emails do not reflect that Roger Lam ever performed any service for Bounty Gain or provided any commodity to Bounty Gain.

Bounty Gain points to an email sent May 14, 2012 at 2:29 p.m. from Roger Lam to "Sandra" and various other persons "RE: Delivery of DDMG shares" for the proposition that Mr. Lam "accepted the task of coordinating the delivery of Bounty Gain's stock and the subsequent sale of those shares at their optimal value, though he could only do that after the delivery was made." [DE 36, p. 6]. However, the body of the email merely reflects that Mr. Lam is inquiring regarding the delivery of certain DDMG shares and whether they were restricted so that he will be able to make the necessary arrangements for the sale of the shares "if Mr. Cheung decides to proceed with a sale upon receipt of the shares" [emphasis added].   Nowhere in this email does it state that the shares involved are Bounty Gain shares as opposed to Mr. Cheung's personal shares.   There is no proof that Mr. Lam is doing anything for Bounty Gain; rather he is assisting his personal client Mr. Cheung on a possible transaction that would only occur if Mr. Cheung decides to proceed with a sale.   This email is entirely consistent with Mr. Lam's two affidavits where he states that he only handled a personal account at UBSFS for Mr. Cheung and never opened or handled an account for Bounty Gain.   [DE 10; 26-1].

Bounty Gain also points to a June 1, 2012 email at 6:37 p.m. from Ed Lunsford, the Senior Vice President and General Counsel of DDMG, to "Sanfrancisco,[9] Natalie Lau[10] and Brian Sullivan,[11]" where Mr. Lunsford discusses that to transfer "your DDMG shares" from

---

[9]  "Sanfrancisco" was Kittie Chan.

[10]  Natalie Lau, a/k/a Natalie Frie, is a partner at Capital Management Zurich, LLC, in Singapore.

[11]  Brian Sullivan was private securities counsel to DDMG.

Amstock to "your UBS account your UBS broker simply needs to contact Amstock to request the transfer."   Bounty Gain asserts that this email, which was cc'd to Roger Lam, Peter Ho, Mr. Cheung and others, establishes that "Mr. Lunsford instructed Bounty Gain to contact its UBS broker to arrange for the stock transfer."   [DE 36, p. 8].   However, there is no express reference to Bounty Gain, and, in any event, Mr. Lunsford's alleged instruction did not bind Mr. Lam or UBSFS to take any specific action on behalf of Bounty Gain.

The next email relied upon by Bounty Gain is a June 3, 3012 email at 9:35 p.m. from Sanfrancisco (Ms. Chan) to Ed Lunsford, Natalie Lau and Brian Sullivan, cc'd to Mr. Cheung, Mr. Ho and Mr. Lam, which asks Roger Lam: "Could you please liaise and make the shares transfer to our UBS AC asap."   Bounty Gain asserts that this is an email from "Kitty Chan of Bounty Gain" asking Roger Lam to get the transfer made as soon as possible [DE 36, pp. 8-9]. However, it is not clear whether the request from Ms. Chan is made on behalf of Bounty Gain, Mr. Cheung individually, or some other person or entity. Further, the reference to "our UBS" account cannot possibly refer to UBSFS since it is undisputed that Bounty Gain never had an account with UBSFS.[12]

The next email relied upon by Bounty Gain is a June 5, 2012 email from Roger Lam, but it does not state to whom the email is directed.   In fact, this email is in a different format from all other emails introduced into evidence by Bounty Gain as this email does not show the recipients of the email or who was cc'd on the email.   [DE 28-3, p. 1; DE 36, p. 9].   This email purports to show that Mr. Lam was providing an "update on the transfer", but nowhere does this email ever mention Bounty Gain; rather, it mentions Mr. Cheung individually. Again, this is

_____

[12] At the April 17, 2015 evidentiary hearing, Bounty Gain's counsel admitted that Bounty Gain did not have an account with UBSFS.   [DE 31, p. 66, lines 6-9].

consistent with all the other evidence in this case that any action Mr. Lam was taking was on behalf of Mr. Cheung individually, not on behalf of Bounty Gain, which never even had an account with Mr. Lam or UBSFS.[13]

The Court finds that the emails introduced by Bounty Gain simply do not establish that Roger Lam or UBSFS were providing a service or commodity to Bounty Gain.   In fact, there is zero evidence that Roger Lam or UBSFS ever performed any service for, or provided any commodity to, Bounty Gain.   Nor is there any evidence that Roger Lam or UBSFS were ever compensated for performing a service or providing a commodity to Bounty Gain.   Rather, the evidence is clear that Mr. Lam serviced an individual account for Mr. Cheung.   Although Bounty Gain would like to make Bounty Gain and Mr. Cheung one and the same, the fact is that Mr. Cheung is a person and Bounty Gain is a company; they are distinct from one another. Merely because Mr. Lam may have provided some services for Mr. Cheung does not mean that he provided any services for Bounty Gain or commodities to Bounty Gain.   The Court finds a dearth of evidence that Mr. Lam performed or provided any services or commodities for or to Bounty Gain.[14]

---

[13]   The Court also notes that in an email dated July 27, 2011, the initial $5,000,000.00 investment is referred to as "Mr. Cheung's investment" and Mr. Cheung is asked to sign "under individual purchaser or Individual Representing Purchaser."    [DE 28-2, p. 3]. The name Bounty Gain is not mentioned anywhere in that email.   The email was not directed to a Bounty Gain email address. Although this email did not involve or include Roger Lam, the statements in the email reflecting a personal investment by Mr. Cheung are consistent with UBSFS' position in this case that Mr. Lam acted only in relation to a personal account held by Mr. Cheung and did not act on behalf of Bounty Gain.

[14]   Moreover, to the extent that Bounty Gain is relying upon the emails to support an inference that Roger Lam or UBSFS (or other UBSFS employees or representatives) provided a service or commodity to Bounty Gain, any such inference is refuted by the affidavits of Mr. Lam [DE 10; 26-1], Ms. Lancaster [DE 11], Mr. Sullivan [DE 24], Ms. Millett [DE 12], and other evidence in this case.

**D.** *Whether UBSFS Has Satisfied the Requirements for a Preliminary Injunction*

As stated above, UBSFS has demonstrated that it has a substantial likelihood of success on the merits as it has shown that Bounty Gain's claim is not arbitrable against UBSFS as Bounty Gain was never a customer of UBSFS or an associated person of UBSFS.   Next, UBSFS has demonstrated irreparable injury will be suffered unless the injunction issues.   *See Dean Witter Reynolds Inc. v. Pollack*, No. 96–6397–CIV, 1996 WL 1044969, at *3 (S.D. Fla. May 29, 1996) ("Where a party has a right to a judicial determination of arbitrability, it would be irreparable for arbitration to proceed on issues which are not subject to arbitration."); *Shadburn*, 829 F.Supp.2d at 1153 ("Courts have concluded that a movant suffers irreparable harm when it is 'forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable.'") (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)).   UBSFS has demonstrated that the threatened injury to UBSFS outweighs whatever damage the proposed injunction may cause Bounty Gain.   *See Pollack*, 1996 WL 1044969, at *4 (finding that "permitting arbitration to proceed on issues which are most likely not subject to arbitration would cause greater injury to the plaintiff than a preliminary injunction which temporarily enjoins arbitration on these *particular* claims until final resolution of this action"); *Shadburn*, 829 F.Supp.2d at 1153 (finding that the balance of harms weighed in favor of entering a preliminary injunction "in light of Morgan Keegan's showing of a substantial likelihood of success that it cannot be forced to arbitrate the underlying dispute and the irreparable injury that flows from forced arbitration.").   Finally, UBSFS has shown that the injunction would not be adverse to the public interest.   *See Pollack*, 1996 WL 1044969, at *4 (explaining that "granting this action does not disserve the public interest because the public has

36

no interest in compelling arbitration of claims which are not subject to arbitration"); *Shadburn*, 829 F.Supp.2d at 1153 ("Given the demonstration of a likelihood of success on the merits, the court finds that a preliminary injunction will serve the public interest by avoiding the time and expense that will result from a needless arbitration.").

Based on the foregoing, the Court finds that the preliminary injunction requested by UBSFS should be granted.

**Conclusion**

In light of the foregoing, this Court **RECOMMENDS** that the District Court **GRANT** Plaintiffs' Motion for Preliminary Injunction.   [DE 7].

**IT IS FURTHER RECOMMENDED** that, pursuant to Federal Rule of Civil Procedure 6(c), Plaintiff, UBSFS, shall provide security in the amount of $25,000 as a condition of the preliminary injunction to pay the costs and damages sustained by Bounty Gain if it is later determined that they have been wrongfully enjoined.   UBSFS shall post this bond forthwith.

**Notice of Right to Object**

A party shall file written objections, if any, to this Report and Recommendation with United States District Judge Kenneth A. Marra within fourteen (14) days of being served with a copy of this Report and Recommendation.   *See* 28 U.S.C. § 636(b)(1)(C).

**RESPECTFULLY RECOMMENDED** in Chambers this 9th day of July, 2015 at West Palm Beach in the Southern District of Florida.

WILLIAM MATTHEWMAN
United States Magistrate Judge